**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NEW YORK MARINE AND GENERAL INSURANCE COMPANY, *Plaintiff*, | ) | ____Civ._____( ) |
| v. | ) | **COMPLAINT** |
| MILLENNIA ASSURANCE, INC., *Defendant.* | ) | |

Plaintiff New York Marine and General Insurance Company ("NYMGIC"), by and through its attorneys Moritt Hock & Hamroff, LLP, as and for its Complaint against the above-named Defendant, hereby alleges as follows:

## PRELIMINARY STATEMENT[1]

1. This action (the "Action") arises from the deliberate refusal and failure of Defendant Millennia Assurance Inc. ("Millennia")—a captive reinsurer—to adequately fund the Regulation 114 Trust (the "Trust"), which secures Millennia's obligation to cover the risks and claims under the insurance policies that NYMGIC, in its capacity as a fronting company, has issued to the parties' underlying insureds.

2. Pursuant to the parties' Reinsurance Agreement and Trust Agreement, Millennia, as the Grantor, is responsible for ensuring the Trust is sufficiently capitalized. The Trust is funded with excess premium payments that are collected by NYGMIC as the primary insurer and

[1] Unless otherwise defined, all capitalized terms used in this Preliminary Statement shall have the meanings ascribed to them in subsequent sections of this Complaint.

ultimately paid into the Trust, which is maintained at Comerica Bank & Trust, National Association ("Comerica"), which serves as the Trustee. Under the specific arrangement among the parties, however, NYMGIC's transfers of the excess premiums into the Trust occur through a circuitous route: the excess premiums are first wired from an account at JP Morgan Chase held by NYMGIC's affiliate, Coaction Specialty Management Company, Inc. ("Coaction Management"), to Millennia's account (the "UBS Account") as its investment manager—UBS Financial Services ("UBS")—with instructions for UBS to ***immediately*** wire the monies to Comerica. This multi-step process for funding the Trust has been the course of conduct throughout the parties' relationship and until this dispute, never presented an issue.

3. With respect to three specific transfers to the UBS Account in December 2021, March 2022, and October 2022, however, Millennia exploited certain administrative and technical errors to wrongfully withhold these monies from being further remitted to the Trust. The three payments at issue, totaling $2,207,896, (the "Misdirected Payments") are the following wires that Coaction Management initiated through JP Morgan Chase for payment to the UBS Account, with the intention that they would then be immediately forwarded to Comerica:

a. December 15, 2021, payment in the amount of $865,419;

b. March 22, 2022, payment in the amount of $403,636; and

c. October 5, 2022, payment in the amount of $938,841.

4. Because of incomplete wiring instructions for the first two payments and an admitted mistake by UBS, UBS failed to further transmit the funds to Comerica. And even though NYMGIC made numerous attempts to remedy the error—and both UBS and Logan Gray of Captive Planning Associates ("CPA")—the captive manager for the Millennia captive—admitted that the Misdirected Payments should have been sent to Comerica—Millennia has steadfastly

refused to direct UBS to wire the funds to the Trust account. To the contrary, it has affirmatively instructed UBS to keep the Misdirected Payments in the UBS Account for Millennia's own benefit.

5. Millennia's willful obstruction of the Misdirected Payments has resulted in the under-capitalization of the Trust and under-collateralization of the risks that NYMGIC has undertaken and ceded to Millennia in violation of the Reinsurance Agreement and the Trust Agreement. Further, Millennia's failure to adequately fund the Trust has caused NYMGIC to incur a Schedule F penalty in its statutory financial statement—a penalty for which Millennia should ultimately be held responsible.

6. Accordingly, NYMGIC respectfully requests that this Court issue a declaratory judgment that Millennia has violated the parties' Trust and Reinsurance Agreements by leaving the Trust under-collateralized, an award of damages associated with and/or resulting from the Schedule F penalty that was imposed on NYMGIC, and such other relief the Court deems just and proper.

## THE PARTIES

7. New York Marine and General Insurance Company is a licensed insurance company organized under the laws of New York State, with its principal place of business in Morristown, New Jersey. NYMGIC is a wholly-owned subsidiary of Coaction Specialty Insurance Group, Inc., f/k/a ProSight Specialty Insurance Group, Inc. and is serviced by Coaction Specialty Management Company, Inc. f/k/a ProSight Specialty Management Company, Inc.

8. Upon information and belief, Millennia Assurance, Inc. is a captive insurance company organized under the laws of North Carolina with its principal place of business in Aberdeen, North Carolina.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

10. This Court has personal jurisdiction over Millennia pursuant to Article 20 (A) of the Reinsurance Agreement (defined below), wherein Millennia irrevocably submitted to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any New York State court sitting in New York City, and waived any objection to the contemplated venue and any objection that this Court is an inconvenient forum or has no jurisdiction over any party to the Reinsurance Agreement. For these reasons, venue in this district is also proper.

## FACTUAL BACKGROUND

### A. OVERVIEW OF CAPTIVE REINSURANCE ARRANGEMENTS

11. Captive insurance or reinsurance is a form of self-insurance that many businesses establish in lieu of traditional commercial insurance because it provides companies with greater control over coverage by mitigating against specific risks. Captive insurance programs also provide the parent company with potentially lower insurance costs, tax advantages, and the underwriting profits.

12. The reinsurance captive—here, Millennia—does not issue policies directly to the insured but, instead, relies on a licensed insurer—here NYMGIC—to act as a fronting company, which underwrites and issues insurance policies to the captive's parent entity. The fronting company transfers the risk to the captive, which agrees to reinsure the risk. The fronting insurance company profits by taking a commission or percentage of the premiums paid by the insured and is also reimbursed by the reinsurance captive for each loss payment it is required to make.

13. Critically, the licensed insurer issuing the policy is assuming primary legal responsibility to pay covered claims to the insured. While the arrangement with the reinsurance captive transfers the risk to the captive, primary liability to pay the claim remains with the licensed insurer, which cannot escape liability if the reinsurance captive does not perform or have sufficient collateral for the losses.

14. Thus, it is critical for the captive to maintain sufficient collateral to protect the obligations of the insurer and its own obligations as the reinsurer to cover the claims. Such collateral is typically provided in either a line of credit from a financial institution, or through a trust—also known as a Regulation 114 Trust—and is highly regulated. Indeed, the requirement to maintain sufficient collateral securing the captive's obligations to reinsure the fronting company's risk, is codified in applicable insurance regulations and typically set forth in the reinsurance treaty between the captive and the fronting company.

**B. MILLENNIA AND NYMGIC ARRANGE A REINSURANCE CAPTIVE PROGRAM WHICH REQUIRES MILLENNIA TO MAINTAIN SUFFICIENT COLLATERAL IN A REGULATION 114 TRUST**

15. On August 7, 2020, Millennia and NYMGIC entered into the Captive Reinsurance Contract (the "Reinsurance Agreement") whereby Millennia agreed to assume one hundred percent (100%) of the liabilities that NYMGIC would accrue as the insurer for the underlying insureds. *See* Ex. A (a copy of the Reinsurance Agreement)

16. In addition to the Reinsurance Agreement, on August 7, 2020, Millennia, as Grantor, NYMGIC, as Beneficiary, and Comerica, as Trustee, entered into a Reinsurance Trust Agreement (the "Trust Agreement"), which established the Trust and set forth the parties' respective obligations. *See* Ex. B (a copy of the Trust Agreement).

17. On or about February 17, 2021, NYMGIC and Millennia executed an amendment to the Trust and Reinsurance Agreements, with effective dates of August 7, 2020. *See* Ex. C (a copy of the Amendment).

18. Section 2.1 of the Trust Agreement provides that Millennia was required to deposit $2,600,000.00 in the Trust as collateral for the reinsurance captive program.

19. Section 2.2 of the Trust Agreement further requires Millennia to maintain sufficient collateral in the Trust by, among other things, depositing additional securities or cash if the amount in the Trust falls below (a) 102% of the net ceded premium under the Reinsurance Agreement; or (b) the "full amount of the Grantor's Obligations due, or which may become due, under the Reinsurance Agreement, less Obligations paid by the Grantor under such agreement."

20. Article 34(B) of the Reinsurance Agreement also requires Millennia to monitor and ensure the Trust is sufficiently collateralized, and to deposit the excess premium payments, or any other funding method available under the Trust Agreement, into the Trust.

21. To further ensure the Trust is sufficiently collateralized, Article 9(A) of the Reinsurance Agreement requires NYMGIC to deposit excess premium payments (premium amounts remaining after all claims, commission, and other fees have been paid for that period) directly into the Trust.

22. If the amount in the Trust exceeds the amount required under Section 2.2 of the Trust Agreement, Section 2.3 provides a mechanism for Millennia to withdraw funds from the Trust with the written consent of NYMGIC.

23. Critically, there is no provision in the Trust Agreement or Reinsurance Agreement permitting Millennia to unilaterally withhold excess premium payments from the Trust if it is dissatisfied or in a dispute with NYMGIC over any issue. Indeed, Section 2.8 of the Trust

Agreement expressly prohibits Trust funds from being utilized as a setoff for other, unrelated amounts owed between the parties. In short, the funds allotted or deposited to the Trust are sacrosanct and cannot be borrowed, withdrawn, utilized, or withheld by Millennia without written authorization by NYMGIC.

### C. MILLENNIA DIRECTS UBS NOT TO FORWARD THE MISDIRECTED PAYMENTS TO THE TRUST, THEREBY LEAVING THE TRUST UNDER-COLLATERALIZED IN VIOLATION OF THE TRUST AND REINSURANCE AGREEMENTS

24. In accordance with the parties' agreements described above, the Trust was funded with excess premiums paid to NYMGIC. Under the particular arrangements between the parties, the transfers of the excess premiums occur in two steps. First, Coaction Management, on behalf of NYMGIC, wires the excess premium amounts from its account at JP Morgan Chase to Millennia's UBS Account. Second, pursuant to the wire instructions from Coaction Management to "further credit" the Trust, UBS then immediately forwards those funds to Comerica. Until this dispute over the Misdirected Payments arose, UBS typically remitted the excess premiums to Comerica without incident.

25. As noted above, the three Misdirected Payments of excess premiums were wired from JP Morgan to the UBS Account on December 15, 2021, March 22, 2022, and October 5, 2022, respectively. But these funds were not further wired to Comerica because, the first two wires omitted the complete instructions to further credit the Trust, and, while the third wire contained the "further credit" instruction, the instruction was cut off and not visible in UBS' system because of a technical glitch.

26. There can be no dispute that the Misdirected Payments were intended to be deposited in the Trust at Comerica and would have been so deposited but for the administrative and technical errors described above. In fact, Ashley Boone, a client services associate at UBS,

acknowledged to NYMGIC that the Misdirected Payments should have been forwarded to the Trust and it was only the administrative issues that halted the Misdirected Payments from automatically being forwarded to the Trust. Similarly, Mr. Gray at CPA agreed that the Misdirected Payments should have been wired to Comerica.

27. NYMGIC has learned, however, that Ralph Tsour ("Tsour"), the principal of Millennia, affirmatively directed UBS to refrain from forwarding the Misdirected Payments to the Trust and, instead maintain the funds in Millennia's UBS Account.

28. Because the Misdirected Payments remained in Millennia's UBS Account, the Trust became under-capitalized, and has remained under-capitalized since the third quarter of 2022 in violation of the Trust and Reinsurance Agreements and applicable insurance regulations.

29. From January 2022 to the eve of commencing this Action, Coaction Management, on behalf of NYMGIC, sent numerous emails and letters to Millennia demanding that it direct UBS to deposit the Misdirected Payments into the Trust.

30. On May 12, 2023, Coaction Management sent Millennia another letter (the "May 12 Letter") reiterating that the Trust was under-funded and Tsour's instruction to UBS to withhold the Misdirected Payments was a violation of the Trust and Reinsurance Agreements.

31. On June 2, 2023, Millennia responded to the May 12 Letter and attempted to justify its refusal to instruct UBS to deposit the Misdirected Payments into the Trust. Among other things, Millennia stated:

a. NYGMIC did not supply any evidence the Trust was under-collateralized, even though NYGMIC provides Millennia with quarterly reports on the Trust which clearly show the Trust was under-capitalized;

b. Millennia claimed it voluntarily increased the premiums paid on the policies to provide a financial cushion and wanted to deduct the overpayment. The alleged overpayment, however, is irrelevant to the under-capitalized Trust and, if anything, would mean the Trust was under-capitalized—and Millennia's obligations under-collateralized—by an even greater amount if it wanted to deduct the alleged overpayments. Moreover, this claim violates Article 34(B) of the Reinsurance Agreement requiring all excess premium payments be deposited in the Trust, and Section 2.8 of the Trust Agreement prohibiting setoffs against monies due to the Trust.

32. In short, each excuse Millennia has asserted for withholding the Misdirected Payments from the Trust rings hollow and violates either the Trust Agreement or Reinsurance Agreement.

33. By the third fiscal quarter of 2022, the collateral Millennia posted into the Trust was underfunded by $630,000. Since then, that figure has continued to increase. As of the filing of this Complaint, the Trust's under-collateralization has grown to approximately $4 million.

34. Despite multiple demands and good faith efforts to resolve this dispute, Millennia has refused to post the required amount of collateral into the Reinsurance Trust.

**COUNT ONE**
**(Breach of Contract)**

35. NYGMIC repeats and realleges the foregoing paragraphs as if set forth herein.

36. The Reinsurance Agreement and the Trust Agreement require Millennia to maintain its collateral obligations in the Trust.

37. Sections 2.1 and 2.2 of the Trust Agreement, as amended, state that Millennia is responsible for ensuring that the Trust maintains (a) 102% of the net ceded premium under the

Reinsurance Agreement, or (b) the "full amount of the Grantor's Obligations due, or which may become due, under the Reinsurance Agreement, less Obligations paid by the Grantor under such agreement."

38. Millennia is responsible under Article 34(B) of the Reinsurance Agreement to ensure that the Trust is sufficiently collateralized by depositing excess premium payments or any other funding method available under the Trust Agreement.

39. The Trust is currently under-capitalized in violation of the Trust and Reinsurance Agreements.

40. Despite multiple demands, Millennia has refused to increase the Trust's collateral by directing UBS to forward the wrongfully withheld Misdirected Payments to the Trust.

**Count Two**
**(Declaratory Judgment)**

41. NYGMIC repeats and realleges the foregoing paragraphs as if set forth herein.

42. The Declaratory Judgment Act provides in relevant part:

> In a case of an actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. §2201(a).

43. As set forth above, and as a result of the facts leading up to the filing of this Action, a case or actual controversy exists between the NYMGIC and Millennia with respect to Millennia's duty to post sufficient collateral to the Trust under the Reinsurance Agreement and Trust Agreements.

44. Accordingly, NYGMIC seeks a declaration that Millennia is required, and will remain required, to post collateral into the Trust to secure its obligations under the Reinsurance Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NYMGIC demands judgment against Millennia as follows:

(1) Declaring that by withholding the Misdirected Payments and permitting the collateral in the Trust to fall below 102% of the net ceded premium under the Reinsurance Agreement, Millennia has violated the Reinsurance Agreement and Trust Agreement.

(2) Requiring Millennia to direct UBS to wire the Misdirected Payments to the Trust held at Comerica;

(3) Declaring that Millennia is required to post collateral in the future in accordance with the terms of the parties' Reinsurance Agreement and Trust Agreement;

(4) An award of damages associated with and/or resulting from the Schedule F penalty that was imposed on NYMGIC; and

(5) Granting any other relief that the Court deems proper and just.

Dated: New York, New York
August 24, 2023

Respectfully submitted,

**MORITT HOCK & HAMROFF LLP**

By: */s/ James P. Chou*

James P. Chou, Esq.
Marshall O. Dworkin, Esq.
1407 Broadway, Suite 3900
New York, NY 10018
(212) 239-2000
jchou@moritthock.com
mdworkin@moritthock.com

*Attorneys for Plaintiff New York Marine and General Insurance Company*